Thank you very much. All right, we'll proceed to the second case, which is 17-10701, Cableview Communications of Jacksonville v. Time Warner Cable Southeast. Mr. Webb is here for the appellant. Mr. Williams is here for the affilee. Once you guys are settled, no hurry. Mr. Webb, you can proceed at your leisure. Please proceed. May it please the Court? Good morning, Your Honor. As you know, I'm Jack Webb. I represent the appellant, Cableview Communications of Jacksonville. Can I ask you just a quick question? Yes. This is just a point of curiosity. Are you the same Jack Webb who was the General Counsel of Cableview during the events in question? Yes, I was, sir. Okay, very good. Thank you, Your Honor. Both lawyer and witness. I'm sorry? Both lawyer and witness. Well, that was actually addressed below, Your Honor. Thank you very much. Very good. We are here, Your Honors, obviously seeking reversal of the entry of summary judgment on behalf of the appellees, Time Warner Cable. Actually, Time Warner Cable Southeast and Time Warner Entertainment Advanced New House Partnership, known as TWEEN, collectively known as Time Warner Cable. Three issues for the Court to consider this morning. Number one is the issue or the question of the existence of an indemnification agreement that ultimately drove the operative facts in this case. Number two is whether or not the Court erred in inferentially constructing the terms of a settlement agreement below that does not exist and the resulting bar of the remaining claims brought by Cableview, sounding in tort and statutory and common law negligent misrepresentation. And number three, Your Honor, whether or not the ultimate payment of the $560,000 to Time Warner by Cableview of Jacksonville, inasmuch as it constitutes some settlement agreement or some sort of resolution to the issue, was in fact procured through undue means, undue economic influence, and whether or not Cableview actually had any reasonable alternatives but to pay the $560,000 and then to pursue its claims in a litigated form. The first, Your Honor, is the indemnification issue. As the record reflects below, Time Warner was a party to an installation agreement that was dated 2004 with Cableview Communications of Jacksonville. That contract, as all of Time Warner's contracts at the time as they mature and evolve over time, had a broad indemnification provision in it between Time Warner Cable and Cableview. However, what was significantly absent from that indemnification provision in the contract was any obligation of Cableview to indemnify any third parties such as Duke Power. Moreover, what was absent from that indemnification agreement as well, Your Honors— You mean it was silent with respect to that? It didn't say anything one way or the other? It was silent with respect to that. That is correct, Your Honor. Moreover, likewise, the indemnification provision was silent, likewise, with respect to any obligation for Cableview to indemnify Time Warner for Time Warner's own contractual indemnification obligations to third parties such as Duke. So at the time of the tender of the demand for defense and indemnification to Cableview, Time Warner tendered the demand on behalf of Duke. As such, it was denied by Cableview and its insurance carrier. Moreover, the demand likewise—excuse me, the operative pleading, which was the McLarty action in North Carolina, alleged counts of negligence against Duke. There were no allegations of negligence against Cableview nor Time Warner, which would bring it within the defense obligation of the indemnification provision. Can I ask you a quick question? So it sounds like we're talking about the merits of the indemnification argument. Yes. But I guess my question is, is it—do they have to show that they're right about indemnification or just that they have an arguable good faith basis to bring the action? Your Honor, the gateway is the duty of defense. You can't get to indemnification once you have defense. There was no duty of defense as per the four corners of the complaint that drove the indemnification issue. As such, to the extent that they have to show the indemnification obligation, Your Honor, in my view, simply because it is ultimately what drove this whole matter to begin with. So does that mean, just so I'm understanding, does that mean that if it's determined on the merits that they are wrong about their position on indemnification, then by definition they had no right to bring the action in the first place? I don't know. It just seems like not the way litigation works. We don't require plaintiffs really ever to be like lock, solid, certain, right before they bring a cause of action. No, Your Honor. It's an excellent question. Your Honor is absolutely correct. They would have been 100 percent justified in bringing their action had they chose to pursue the action. That is, had they continued with the—there were two actions. There was the McLarty negligence action against Duke Power, which drove the indemnification claim. And then there was a subsequent action brought by Time Warner against Cableview, likewise in North Carolina. That was actually filed or, yeah, it was filed after the consummation of the $560,000 extracted payment. But, Your Honor, you are exactly right. They would have been 100 percent justified in pursuing that claim. That would have made perfect sense. That would have made it right for everyone. That would have provided a forum for Cableview to adjudicate whether or not they in fact owed the $560,000. And therefore, it seems to me along the lines that Judge Newsom is talking about, the district court found that you settled this case. And it does seem to me they had enough reason to make their McLarty claim against you. And if you did settle, then the game is over for you, like the district court said. So it seems to me that your only real claim in this case of any arguable merit is that your payment in the settlement was induced by duress. Would you address that? Well, Your Honor, we would submit to the court respectfully that the inferential construction of a settlement agreement by the district court was incorrect. Moreover, to the extent that the district court ruled as a matter of law the creation of the settlement agreement somehow barred our independent tort claims. Why would it not? You knew all of the things that you now know when you agreed to pay the $515,000. So it seems to me that unless you paid that under duress, which I think you have a pretty good argument there, it seems to me the settlement does bar you. Well, Your Honor, again, I would suggest that you are quite correct. The court is quite correct in that no reasonable alternative existed for Cableview but to pay that money at the time. What the court missed below or what the court failed to consider properly evidentiary-wise was the scope and the timing of the transition of the operations. To what extent had the transfers already taken place before February 28? It was done, Your Honor. In fact, there was a dry closing a week before is my understanding. It was ready to go. And what did that entail, transfer of employees and equipment? Equipment, plant, facility, employees, security clearances for the transition Cableview employees, yes, Your Honor. Were there already Vandoa contracts entered into between Time Warner and FTS? Your Honor, the record is kind of confusing in that regard. They were ready to go, though, Your Honor. Whether or not there were new contracts that were executed between FTS, Unitech, and Time Warner in the Ohio operations or if they had simply assigned them, it's not determined, but they were ready to go. The contracts were in place. The only snag, the only snafu, the only bottleneck in the transition of flipping the switch on the close date was, in fact, the Greensboro operation. And that snafu did not occur until the day before the close, Your Honor. And what was that snafu? That was the delivery of a letter from Diane Blackwood from Time Warner to FTS Unitech. Again, FTS Unitech, not to Cableview, demanding that as a condition of the close of the transaction, Your Honor, that Cableview, excuse me, that FTS Unitech assume responsibility for not only the McLarty action and liability or the 500 or whatever they claim they were owed, but for all of Cableview's ongoing contractual obligations vis-à-vis Time Warner. To prove U.S., you would have to prove that there were no reasonable alternatives other than paying the $515,000. That is correct, Your Honor. Why did you not have reasonable alternatives? District court suggested you did. District court, I believe, misconstrued or failed to properly weight the evidence of the operational pandemonium that would occur as a result of not going forward with the operation. Cableview didn't have any employees left. They were all FTS employees. Cableview's physical plant, the operation had already been transitioned. The lease had been assigned to FTS Unitech. The FTS Unitech was now in the Time Warner system. If they were not able to move forward, the result would have been Cableview would not have been able to perform. There would have been falldowns in service, resulting in significant back charges to Cableview, which would have caused them further economic harm, Your Honor. The best that Cableview could do at that point was acquiesce. Can I ask one more question? Please. It seems to me, as suggested, and I will ask your opponents about that, that you have a strong argument on duress, which would set aside the settlement and get you a remand. But it seems to me that there's not much chance that you're going to be—I mean, I've looked at those indemnities and they look pretty strong to me. Unless you can get out of the indemnity on some technical ground, it seems to me you owe whatever the McLarty settlement was, and that's fixed. You can't do anything about that. So the only thing you can do is nitpick their attorney's fees. Is that not true? And I'm wondering whether it warrants continuing this litigation. Yes, Your Honor, we do, because we do believe we will prevail on the indemnification issue, Your Honor. Again, it's interesting to see the way the Time Warner contracts have evolved since this incident. Your Honor, with regard to the indemnification issue, it's very interesting. We did not—what's significant is that Time Warner, when the initial demand for indemnification was made on behalf of Duke, not on behalf of Time Warner, it was forwarded to Coverage Counsel in Washington, D.C. for review. Coverage Counsel repeatedly responded to the demands from indemnification to Time Warner saying, just think so. It's not so. There's a gap here. You have a Time Warner contract with Duke Power that's an indemnification provision. You've got a contract between Cableview and Time Warner that has an indemnification provision. But there's nothing that links. There's a gap. There's a crack in the argument. I thank you for answering my question. Okay, very good. Thank you, Your Honor. Thanks so much. Mr. Williams. Good morning, Your Honors. May it please the Court. Despite what I think is a disproportionately large appellate record in this case, I think it's a relatively simple case of buyer's remorse. The appellant, Cableview, in this case, voluntarily settled their disputed indemnity claim with Time Warner, expecting its insurance company to foot the bill for that settlement. When the insurance company said, no, we're not going to do that, Cableview turned around and sued Time Warner to try to get its money back. And I think it's important to point out that that's not our characterization of the events. That's what Cableview's CEO testified to in his deposition multiple times. Let me ask you this, and we'll get it out soon. It seems to me that there's a very strong argument that these payments, $515,000, were, or at least issues of fact, summary judgment posture, were made induced by duress. You don't respond to the blue briefs, your opponent's briefs, argument about the restatement, section 175, comment B, illustration 4, page 21 of their brief. And it reads, I'm paraphrasing, as an example of duress, lessee promises to vacate premises for $10,000 to permit the landlord to demolish the building. However, at the last minute, the lessee refuses to do so unless the landlord buys his worthless furniture for $5,000. Although the landlord could delay and pursue eviction remedies, restatement held that a material delay would cause financial loss to the landlord, thus constituting duress. How do you respond to that? It seems to me our case is similar. So two responses to that, your Honor. First, the actual restatement quote says, if a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim. I think that's the rub in this case. I agree. Both of those are required. And it seems to me the improper, obviously, Time Warner had a right not to consent. But what it did not have a right to do was lead Cableview on that it would consent, let them go ahead and complete, almost complete, substantially transfer assets. And then at the very last minute, just like in the restatement, say no, you've got to pay me $515,000 or else you can't do that. In that letter that he referred to on March 1st, Frank Flatt said FTS cannot do the work for Time Warner, notwithstanding the fact that I think a reasonable jury could find that already some contracts had been entered into between Time Warner and FTS. And I know even with Greensboro, the vendor form had been mailed with the message that sign this and that's all you need. So why is that not duress just like in the restatement? Well, again, two responses, Your Honor. First, I think, respectfully, I disagree with the characterization of the record. Time Warner didn't lead Cableview to believe that it was going to execute a written assignment. And that's a confusion of the record that Cableview has persisted in in this case. But there is no document in the record where anyone at Time Warner says we're going to give you this written assignment of the 2011 agreement. It doesn't happen. And the reason that's important is because that has to be Cable's theory in this case. The 2011 agreement required a written assignment. And it's undisputed that there's no written assignment of that contract until the APA closes in March 2012. But there were representations by Sierra. Is that how you pronounce his name? As far as I know. That the transfer would be approved. According to some email, and I can't remember right now, but he was asked and he said yes. And then, in fact, I think in the Ohio region, a contract with FDS was actually entered into. That's an important distinction, Your Honor, because there's a big difference between bringing in a vendor as a new vendor. I mean, you see the form is called the new vendor form that he sends over. Huge difference between bringing in a vendor as a new vendor and getting them cycled up and started on Time Warner's compliance scheme. Which a reasonable jury could find did happen, is that not? I'll concede that. But there's a difference between that and actually agreeing to assign a pre-negotiated contract with a different vendor with its pre-negotiated terms, favorable terms. Honestly, to FTS. But when you have a meeting and you're talking about meeting between Cableview, FTS, and Time Warner, and they're talking about this transfer and asked Sierra, is this transfer okay? Sierra answered yes. And then it is also clear that Sierra and the other regional managers knew that they were proceeding with the implementation. There's an email that talks about transferring the fleet. So Time Warner's regional managers allowed this transfer to go forward until the day before, two days before the closing. Is that not true? I don't think it's quite accurate, Your Honor. I think, again, a transfer is not necessarily an assignment of an agreement with particular terms in the agreement, such as price for services and things like that. Again, the critical distinction is whether or not there was a promise by Time Warner not to assign the agreement. If Sierra said, he never said this, but let's assume that Sierra said, yes, the agreement is assigned, the 2011 agreement is assigned. That's invalid. The 2011 agreement requires it. So you're relying upon the technicality between the legal assignment of the Cableview-Time Warner agreement, on the one hand, as distinguished between the agreement that it can actually be transferred, all of these assets, all of these employees can be transferred, FTS will be able to take over and string the wires and so forth that Cableview has previously been stringing, but you're making the technical distinction between the actual agreement that it can be done, the transfer can be done, and saying, yes, we will assign. That's your argument? Yes, Your Honor, but I don't think it's a technicality. I think, again, I think there's a distinction between promising to us. Basically, the theory that Cableview has advanced is that Time Warner said, we're going to give you a written assignment because you need a written assignment, it requires a written assignment, and then at the last minute, yanked the rug out from under them. That just didn't happen. Time Warner didn't parachute in at the last instant to wreck this deal. You've got any case that suggests that kind of technicality cannot amount to duress, which is a kind of an equitable concept? Not on that particular point, Your Honor, but that leads me to my second point, and I see I'm not making much headway on the prior point. I'm only one judge. You've got two other judges. And you can persuade me, I mean, if you can, but I haven't heard any persuasion. Can I ask you one question about this before you move on to point two? So in thinking really about the negligent misrepresentation piece of this case, it dawned on me that there's a reliance component of that cause of action. I don't know, frankly. When you're talking about duress, is there any sort of reliance component to a duress claim? And if so, does the same argument you made with respect to negligent misrepresentation sort of apply here that no matter what Sierra said, you simply wouldn't have been justified in relying on it knowing that the 2011 agreement requires written consent? It's a similar argument, Your Honor. It's not technically reliance, but I think it dovetails into the no reasonable alternatives aspect of the duress argument. So when we're talking about reasonable alternatives, what the district court found was that, I think as Your Honor pointed out in my adversary's argument, that when the APA closed, Cableview was on notice of all the facts that it needed in order to determine whether it wanted to make this payment or whether it wanted to not make the payment. And there was a reasonable alternative for Cableview to pursue here. Cableview could have said to FTS, look, we're just going to carve this 2011 agreement out of the APA. We're not going to assign it to you because Time Warner won't consent. We'll close the APA without it, and then we'll go ahead and we'll litigate our disputed indemnity claim. What were they going to carve out? I'm sorry? What were they going to carve out? In this instance, what Cableview would say, and I think Cableview has admitted that FTS did not need the assignment of the 2011 agreement in order to perform work for Time Warner. So Cableview could have just said, let's do this APA and we'll not assign you this specific contract that Time Warner has not allowed us to assign to. Well, Blackwood's letter said that until this $515,000 is paid, FTS cannot work for Time Warner. I don't believe that's exactly what the letter said. I think the letter said until this situation is resolved to our satisfaction. And so one way that it could be resolved to Time Warner's satisfaction, of course, is to have Cableview able to litigate this disputed claim and for Time Warner to proceed against Cableview. Time Warner never wanted to sue FTS on this disputed indemnity claim. Time Warner just wanted to make sure that Cableview had assets to proceed against if it was going to, you know, handle this indemnity claim. But what Cableview did is not to, you know, resolve this indemnity claim with Time Warner. I'm going to read you what the letter said. Until this matter is fully resolved to Time Warner's satisfaction and FTS agrees in writing to accept all obligations under the Cableview-Time Warner contracts and any liabilities, both Table and Time Warner will not consent to the assignment of any contracts. Correct, Your Honor. FTS is not presently authorized to perform work for or on behalf of Time Warner under any such contract. Therefore, Blackwood has already said that you can't carve out the mere assignment like you are suggesting. It says that FTS cannot work. To be clear, Your Honor, it says FTS is not presently authorized to perform work on behalf of Time Warner under any such contract, meaning we haven't assigned the 2011 agreement over yet. They're not presently authorized. Time Warner will not consent to that assignment until the situation is resolved to Time Warner's benefit. So what Blackwood is saying is that we have this indemnity claim against Cableview. We need that to be resolved or at least to know that we'll be able to proceed on our claim against some sort of company that has assets. Otherwise, FTS is not authorized to perform work under that contract. She didn't say FTS is never going to be authorized to perform work for Time Warner, and in fact, as you pointed out, Your Honor, the Sierra email had attached a new vendor form for FTS. So that gets back to this distinction, which I think Your Honor felt was technical. I don't feel it's technical at all. I think that the distinction between performing work for Time Warner under the 2011 installation agreement is different than performing work for Time Warner generally. But this deal doesn't work if FTS can't perform work on behalf of Time Warner, correct? I would rephrase your question a little differently. Does the deal work if FTS can't obtain the assignment of the 2011 agreement? Absolutely. Cableview has conceded to that. They've said that FTS didn't need the assignment of the 2011 agreement to perform work for Time Warner. But FTS needs to be authorized to somehow enter some sort of agreement with Time Warner. I believe that's probably correct. I don't know that there's record evidence suggesting what FTS required as part of that deal, but I think it's reasonable to assume that that was a big deal for FTS. But that letter doesn't say, well, we're not going to consent to the assignment of the 2011 agreement, but hey, let's go ahead and enter into a separate agreement. It doesn't say that expressly, but it does qualify the statement. FTS is not presently authorized to perform work under any such contract. Again, that was a contract with favorable terms for Cableview. I think you've got a strained interpretation because another, either in this same letter or another email, it is expressly said that you cannot, Time Warner to Cableview, you cannot transfer your assets to FTS until we resolve this matter. I'm not familiar with the email that you're referring to. I'm sorry, Your Honor. If I can make one other point, though, regarding the issue of the settlement. As we argued in our papers, what happened before the settlement, again, I'm not making much headway on that issue, I understand, but whatever happened before the settlement is ultimately immaterial because there was a settlement, there was an APA, and then there was the joint wiring instructions where Cableview clearly consented to the payment of the money to Time Warner from the proceeds of the sale under full knowledge of all the facts that then existed and ultimately came to exist. So for Cableview to now say that we can get our money back without, number one, restoring any of the consideration to Time Warner that was given as part of that contract, which undisputedly cannot be given back, is a little beyond the pale. And ultimately, that settlement acted as an accord and satisfaction of the tort claims that Cableview is now bringing against Time Warner. It did, of course, unless the payment under that settlement was induced by duress. Unless procured by duress. And I agree with you. I don't see how they are going to get out of paying you most of what you are asking for, probably, although I honestly haven't studied the indemnity. I've just looked at them, but I had not thought that you couldn't indemnify to cover your indemnities, indemnity liability itself. But aside from that, I think they are going to have to pay you. And it does seem to me like you all ought to settle this case. Understood, Your Honor. I believe I am out of time. Thank you so much. Mr. Webb, five minutes. Thank you, Your Honors. I don't believe that I'll need the entire five minutes. Thank you again. With regards to the assignment issue, the assignment seems to be somewhat of a red herring inasmuch as we've kind of all hyper-focused on this one assignment of document. The underlying pleading, the amended complaint, which is the operative complaint, the operative pleading in this case, when it talks about, discusses the factual allegations with regards to Mr. Sierro, it never says that Cableview had a conversation with Mr. Sierro. Mr. Sierro uttered the magic words, I consent to assign this document. That never occurred. Mr. Sierro, like the Cableview principals and like the FTS principals, are all cable dogs. They're not lawyers. Mr. Sierro was the Director of Technical Operations who effectively blessed the deal. And that occurred sometime in January, I think January, mid-late January of 2012. Time Warner, FTS, and Cableview all acted in a matter consistent with that blessing of the deal and the transition. Now, again, the assignment issue, there's no disputing that the 2011 Cableview-Carolina agreement, which ultimately was the document that was assigned or the consent to assign, was executed to transfer to FTS Unitech. There's no doubt that that had language in there that requested any assignment had to be in writing. So we get that. But, again, to Your Honor, Your Honor asks the question, were the assignments necessary? Could FTS have done business with Cableview through another means? Well, yeah, yes, they could. In fact, they probably did in Ohio where they executed new agreements, if not assigned those agreements. It could be that they did execute new agreements. So it was a transfer of the operations. Now, to the extent that the contractual relationships that Cableview possessed with Time Warner constituted an intangible asset that had value, well, certainly that's part of the valuation of the deal. So that's with regards to the assignment issue. Did Cableview, when Time Warner says, no, I know you've transferred all this stuff, but, no, you need to resolve this $500,000 with us. Did Cableview ever communicate to Time Warner, oh, my gosh, you're killing us, this is anything that Time Warner realizes, oh, my goodness, they're over a barrel here? Or did you just say, okay, here we go, let's get it resolved and move on? Your Honor, the record below will reflect ongoing communications with Mr. Schiezer, who is the president of Cableview, and Diane Blackwood, and their huddle team, the Time Warner group, Daryl Hagar, their counsel, Lou Glenn, the gentleman from New York, Craig Goldberg, who is in the general counsel's office in New York. They all worked together to kind of come up with the terms that would be acceptable to Time Warner to agree to this close. Significantly, one of the things that was discussed, we'll set the $560,000. At this point, it started out at $320,000, then it went to $400,000, it ultimately became $515,000. I've got the exact number written down, $515,000 and change. At the time that the money was available for distribution from FTS, the number had grown, despite the so-called finality of the essential financial term that was inserted into the asset purchase agreement. But the point is, how about escrow the money? How about escrow the money? There were allegations below that there was some sort of fraudulent transfer going on here. It wasn't a stock sale, it was an asset transfer. If you wanted to lock up the $560,000, we could have done that. I just want to make sure that Judge Branch gets an answer to her question. I don't think you've answered it yet. She asked you, is there anything in the record to suggest that you or your clients said to them, you're really holding a gun to our head here, this isn't fair, or did you just pay it? Your Honor, when CableU first became aware of the lawsuit, that is the indemnification claim, it was pursuant to the application for extension of time to file the complaint. That was in February 17, 2012. It was provided to CableView. I got a copy of it, and I spoke with Mr. Glenn in North Carolina. My exact words, perhaps a little bit more colorful at the time, actually, no, this was when the Diane Blackwood letter was dropped on CableView. My exact words were, what are you doing tortiously interfering with my client's deal? So, yes, we did object, Your Honor. Objected, but I guess did you, you know, Judge Anderson has pointed out that your strongest argument is duress, and I'm trying to figure out, like, did you ever sort of complain about feeling like you were under duress? And I think that's what Judge Branch is asking you. I mean, this goes to the very last point, I think, that your adversary was making, as he said, you know, look, even sort of getting beyond sort of, you know, the supposed duress, in the end they paid it with full knowledge, and that sort of wipes the slate clean. Well, I think, Your Honor, that's an excellent question, and I think my colleague somewhat misconstrues the record below with regard to time to CableView having full knowledge of whether or not this indemnification demand was, in fact, valid. Again, Time Warner, CableView had reported this, had disclosed this matter to FTS Unitech as a workers' compensation matter. Again, when Time Warner tendered the defense of indemnification in 2009, CableView never heard anything back from Time Warner until such time as the day before the closing. So, Your Honor, at that point, there was a lot of education that needed to occur as to who's McLarty, what happened here, why did First Mercury deny it, what is going on here, are the representations being made by Time Warner and its counsel with regards to the fall down by the insurance company, in fact, accurate? Over that period of time, Your Honor, we discovered that they were, in fact, not accurate. Got it. Thank you, Your Honors. Thank you so much. All right, so we're going to go straight to the third case rather than breaking. The third and final case is 16-16452, Chambly v. The State of Florida. Okay. Throwing a curveball to the judge presiding for the first time. We have no lawyer here for the appellant. Yes. Give us a sec. I think we ought to let them talk. Okay. Hey, Valerie. All right, well, this is odd. I think we're inclined, Mr. Jordan, to let you say your piece if you'd like. Well, Your Honors, I'm not quite. Bear with me for just a minute. What we might do is let him say his piece and then send the party, if we figure he's got a real good excuse, send him a copy of that and let him file a supplemental brief. Yes. You wouldn't object to that, would you? We'll let you talk here. If it turns out that your adversary has got a legitimate excuse, he's, you know, snarled up in traffic on I-20 or whatever, we'll allow him a very brief written response to the argument that you've made here and effect a rebuttal. I have no objection to that. Okay. Very well. All right. Proceed. Your Honors, Brian Jordan representing.